*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | |
|---|---|
| *JANE DOE, individually and as next*     ) <br> *friend of JOHN DOE, a minor,*     ) <br>     ) <br>     *Plaintiff,*     ) <br>     ) <br> *v.*     ) <br>     ) <br> *REGIONAL SCHOOL UNIT NO. 21,*     ) <br>     ) <br>     *Defendant*     ) | *No. 2:11-cv-25-DBH* <br> *(FILED UNDER SEAL)* |

**RECOMMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Jane Doe, parent of student John Doe, challenges a decision of a Maine Department of Education ("MDOE") hearing officer ("hearing officer") issued pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and its state-law analogue, 20-A M.R.S.A. § 7001 *et seq.*, to the extent that the hearing officer directed that, once the defendant school system had undertaken certain assessment and planning, it could determine whether John Doe would remain in his neighborhood school or could be transferred to a different elementary school where more intensive services were offered. She also seeks an award of attorney fees "as the prevailing party in [the] administrative proceeding[.]" Plaintiff's Memorandum of Law ("Parent's Brief") (ECF No. 52) at 1. The defendant, Regional School Unit No. 21 ("RSU 21"), also appeals from that portion of the hearing officer's ruling that required it to obtain a functional behavior assessment by a board certified behavior analyst and to develop a behavior intervention plan for John Doe. Memorandum of Law in Opposition to Plaintiff's Appeal and in Support of Defendant's Counterclaim ("Defendant's Brief") (ECF No. 55) at 14. After careful review of

the voluminous record filed in this case, the additional evidence submitted by deposition with the court's permission, and the parties' memoranda of law, I propose that the court adopt the following findings of fact and conclusions of law, on the basis of which I recommend that the appeals of both parties be denied.

## I.  Proposed Findings of Fact

1.  John Doe was born on January 15, 2004.  Special Education Due Process Hearing ("Hearing Decision") *[Doe] v. Regional School Unit No. 21*, No. 11.011H (Me. Dep't of Educ. November 17, 2010), at 3, ¶ 1; Administrative Record ("Record") at 975.  He lives with his mother and older sister in Cape Porpoise, Maine.  *Id.*  Both he and his sister attend Kennebunkport Consolidated School ("KCS"), which is their neighborhood elementary school. *Id.*  His mother adopted him when he was 1½ years old.  *Id.* ¶ 3.

2.  John is eligible for special educational and related services under the category of Other Health Impairment.  *Id.* ¶ 2.  He was evaluated at age 3 by Child Development Services. *Id.* ¶ 4.  His total language score was in the first percentile, indicating a significant delay in language skills in both expressive and receptive language.  *Id.*  He showed moderate delays in fine motor development.  *Id.*  A psychological evaluation revealed a 68 IQ equivalent, placing him in the second percentile.  *Id.*  The psychologist recommended a developmentally therapeutic preschool program with emphasis on general language, cognitive enrichment, and building of attention span.  *Id.*

3.  During the 2007-2009 school years, John attended preschool programs and received language/speech, occupational, and physical therapy at Child's Journey Preschool in Arundel, and the Spurwink Therapeutic Preschool.  *Id.* ¶ 5.  John made significant gains and enhanced his language development at these programs.  *Id.*

2

4.   In September 2008, John was referred to the Pediatric Evaluation for Development Solutions Program for evaluation due to concerns about his developmental delay, hyperactivity, and previous evaluations suggesting possible mental retardation.  *Id*. ¶ 6.   Part of the evaluation was conducted by Laura Slap-Shelton, Psy.D.   The resulting diagnoses included ADHD-combined type, anxiety disorder not otherwise specified ("NOS"), low average cognitive ability, global developmental delay, mixed expressive and receptive language disorder, phonological disorder, and fine and gross motor delays.  *Id*.  He scored a verbal IQ of 83, a performance IQ of 82, and a full-scale IQ of 80.  *Id.*

5.   In preparation for John's transition to kindergarten, the plaintiff wrote a letter to the Individualized Education Plan ("IEP") team describing his needs and what she believed had helped him.  *Id*. ¶ 7.  She stated, *inter alia,* that John "copies behaviors, so inclusion with a regular classroom is very important.  I do not want him in a behavioral classroom."  *Id*.

6.   In the spring of 2009, Kristine Casey, the special education teacher who runs a program at Kennebunk Elementary School ("KES") for students with behavioral challenges, observed John in his program at Spurwink.  *Id*. ¶ 8.  Her program serves 11 students in grades K-3.  *Id*.  All students are assigned to the mainstream classroom, and each attends at least once a day, but some spend more time in the mainstream classroom.   *Id*.  Lunch and recess are with mainstream peers.  *Id*.  As students meet their goals, they are mainstreamed more using a "level" system.  *Id*.  She has four educational technicians, each of whom works with all of the students and team with regular education teachers and specialists.  *Id*.   All are trained to work with students with behavioral needs.  *Id*.   Casey's team also includes an occupational therapist, a physical therapist, a school psychologist, a speech/language therapist, and a social worker.  *Id*.

7.  On May 19, 2009, an IEP team meeting was held to consider John's transition to kindergarten.  *Id.* ¶ 9.  Special Education Director Susan Mulsow suggested placing John in Casey's program at KES because it was similar to his program at Spurwink in which he was doing well.  *Id.*  The plaintiff was adamantly opposed to this and wanted John to be given an opportunity to attend the less restrictive program at KCS.  *Id.*  A majority of the team members agreed to try this placement with educational technician support for six to eight weeks, and then reassess John's progress.  *Id.*  Christine Peskurich, the resource room teacher at KCS, was assigned to be John's case manager.  *Id.*  John was to be mainstreamed, with 6.5 hours per day of educational technician support, and the following services: 90 minutes per week of speech therapy; 60 minutes per week of occupational therapy; 30 minutes per week of physical therapy; 30 minutes per week of social work services; and one hour of special education consultation.  *Id.*

8.  John was placed in Kathy Cmaylo's kindergarten class, where Cmaylo immediately faced challenges with John's inability to comply with directions or stay on task.  *Id.* ¶ 10.  Compliance problems affected his entire day.  *Id.*  Cmaylo initially had two educational technicians assigned to support three students.  *Id.*  When their efforts did not work, she would have Peskurich come to her classroom to help with John so that Cmaylo could focus on her other 15 or 16 students.  *Id.*  The noise John created, and the time Cmaylo had to spend directly with him, interfered with the learning of other students.  *Id.*  John also needed support once given a task.  *Id.*  Due to his behavior, other children were afraid to play with him.  *Id.*

9.  After a few weeks, Peskurich sought help from Casey, reporting that she was having a very difficult time with John and asking for suggestions and perhaps an example of a behavior plan.  *Id.* ¶ 11.  Peskurich runs a resource room with approximately 20 children in grades K-5, most of whom have learning disabilities.  *Id.*  She is certified in many reading and math

programs, but does not have specialized training in working with children with behavioral problems. *Id.* Two educational technicians assist her in the resource room. *Id.*

10. After receiving advice from Casey, Peskurich turned to the school psychologist, Joseph Wojcik, for a behavior plan. *Id.* Wojcik observed John on four occasions, noting that the behaviors to be addressed were speaking out of turn and refusing to comply with teacher directions. *Id.* He recommended developing a behavior plan to address these issues and made suggestions for providing positive reinforcement and praise. *Id.* Peskurich then incorporated these suggestions into a "positive behavioral support/intervention plan" form she downloaded from the Internet. *Id.* She did not conduct a formal functional behavior assessment (FBA) as defined in the Maine Uniform Special Education Regulations. *Id.* Although she did not share this document with the plaintiff or Dr. Wojcik, she used it regularly in working with John and prepared data collection charts to test the effectiveness of the interventions. *Id.* John also had quiet areas in Cmaylo's and Peskurich's rooms and was provided support whenever he needed it. *Id.*

11. The IEP team met on December 17, 2009, to discuss how John was progressing in school and his behavioral challenges. *Id.* ¶ 13. Peskurich shared data charts that she and her staff had compiled of John's challenging behaviors. *Id.* The team agreed that John would begin receiving math and reading instruction for 45 minutes per subject per day in the resource room. *Id.* The team also agreed that John should go to the resource room at the end of the day with the classroom educational technician to process the day and his behavior of the day. *Id.* John received rewards under Peskurich's system of positive behavioral supports. *Id.* Other methods to address John's behavior challenges were also discussed. *Id.*

12.  Throughout the rest of the school year, John's behavior continued to be a problem. *Id*. ¶ 14.  Peskurich felt that her behavioral plan was not working overall and was very frustrated because she want to help John but did not see any measurable improvement.  *Id*.

13.  At its January 25, 2010, meeting, the IEP team agreed to evaluate John in the areas of academic development and intellectual testing and to conduct a formal classroom observation. *Id*. ¶ 15.  The report of these evaluations, dated April 15, 2010, was shared with the plaintiff before the April 29, 2010, IEP team meeting.  *Id*.  John's WISC-IV[1] scores were verbal comprehension, 85; perceptual reasoning, 73; working memory, 74; processing speed, 94; and full scale IQ, 76.  *Id*.  The behavior rating scales completed by the plaintiff, Cmaylo, and an educational technician all indicated serious problems with aggression, hyperactivity, impulsivity, and peer relationships.  *Id*.

14.  On April 26 or 27, 2010, the plaintiff and Krysten Harper, John's Spurwink case manager, met with Peskurich to discuss the evaluation report.  *Id*. ¶ 16.  Peskurich felt overwhelmed by her duties, including her responsibilities toward John.  *Id*.  Cmaylo thought that she had made a Herculean effort with John, but it was unsuccessful, and what they tried to do was not enough to meet John's needs.  *Id*.  Mulsow called during the meeting and told Peskurich that she should not be having such a meeting with the plaintiff by herself.  *Id*.  Peskurich reported that Mulsow thought John should be placed in the program at KES.  *Id*.  The plaintiff was strongly opposed to this.  *Id*.

15.  At its meeting on April 29, 2010, the IEP team discussed John's annual review, recent evaluation, and previous IEP goals.  *Id*. ¶ 17.  Despite the school's best efforts, everyone agreed that what they were doing was failing.  *Id*.  Mulsow and Dr. Wojcik proposed that John

---

[1] The Wechsler Intelligence Scale for Children—Fourth Edition.  *T.L. ex rel. B. L. v. Department of Educ. of City of New York*, No. 10-CV-3125 (SLT) (LB), 2012 WL 1107652, at *1 (E.D.N.Y. Mar. 30, 2012).

would benefit from the self-contained program at KES. *Id*. The plaintiff did not agree, so the team did not write an IEP that day. *Id*. The plaintiff said that she wanted more positive behavioral supports in the classroom and a written behavioral plan. *Id*. Mulsow asked the plaintiff to visit the KES program to observe and speak with the teacher, after which the IEP team would reconvene. *Id*. The team agreed that it would compile a list of John's educational needs prior to reconvening. *Id*.

16. On May 10, 2010, the plaintiff visited the KES program and wrote a letter to Mulsow saying that she thought such a placement for John was premature and would not be a good fit. *Id*. ¶ 18. The plaintiff said that the activity that she observed reminded her of preschool, that the program was geared toward "behavior first and academics second," and the educational technicians at both KCS and KES had the same training. *Id*. She felt that John's behaviors were secondary to his learning needs. *Id*.

17. The IEP team met again on May 13, 2010. *Id*. ¶ 19. There was little disagreement about the IEP drafted by Peskurich, but the plaintiff disagreed with the rest of the team about placement. *Id*. The team determined that John had not made sufficient progress with the current IEP and that placement at KCS was not working for him. *Id*. The new IEP included two 30-minute sessions per week of speech and language services, 30 minutes per month consult for social skills, physical therapy for 30 minutes per week and 30 minutes per month consult, two 30-minute sessions per week of occupational therapy, and 4.5 to 6.5 hours per day in the special education setting. *Id*. Most of the team thought that John would benefit from social work services, but the plaintiff declined such services. *Id* The team agreed that John should have a maximum opportunity to be mainstreamed with support throughout his day. *Id*.

18.   At Mulsow's invitation, the plaintiff again visited KES for an observation before the end of the school year.  *Id*. ¶ 21.  This did not cause her to change her views.  *Id*.  Despite grade reports that showed that John was making progress in the classroom, Cmaylo was not satisfied with his progress over the course of the school year, and felt that he did not get what he needed from kindergarten, due to the challenges presented by his disabilities.  *Id*.

19.   The plaintiff sought an independent evaluation with Slap-Shelton in July 2010.  *Id*. ¶ 23.  Although she did not complete her evaluation or report in time for the administrative hearing, she testified about her recommendations for John.  *Id*.  She recommended, *inter alia*, that the school conduct a functional behavioral assessment of John and referred him to Elizabeth Fagan, a speech and language pathologist, for an auditory processing evaluation.  *Id*.

20.   Fagan tested John and concluded that he had an auditory processing disorder.  *Id*. ¶ 24.  She recommended that John be seen by an audiologist when he reached the age of 7 and that he receive direct therapy three to five times per week.  *Id*.  After reviewing the results of Dr. Fagan's testing, Dr. Slap-Shelton concluded that John's language processing impairments and hearing loss were likely to play a substantial role in his behavioral difficulties in the classroom and needed to be addressed and accommodated by his school.  *Id* ¶ 25.  It was her opinion that John did not need to be in a self-contained classroom.  *Id*.  She recommended that an educational technician trained to respond to John's behavioral plan work with him most of the day.  *Id*.

21.   The plaintiff requested a due process hearing on August 6, 2010.  *Id*. ¶ 26.  She invoked John's stay-put rights so that he would stay at KCS pending the outcome of her challenge to his IEP.  *Id*.

22.   For first grade, John was assigned to Julie Urban's class.  There were 17 students in this class, and John had a one-to-one educational technician.  *Id*. ¶ 27.  Peskurich remained his

special education teacher. *Id*. Her staff of educational technicians had been reduced to two. *Id*. Urban reported similar problems to those John encountered in kindergarten. *Id*. Because of the number of pull-outs for special services, John's day was very disjointed, and the many transitions were a problem for him. *Id*. He was disruptive when the class was doing a task he did not like. *Id*. Peskurich became intimidated by the plaintiff because she was asking for things Peskurich could not do, and she was the person to whom the plaintiff spoke when she was angry. *Id*. ¶ 28.

23.    After a whole-school meeting in the gym on Friday, September 10, 2010, the plaintiff went to Urban's classroom, at which time Urban called Principal Crandall and asked for help. *Id*. ¶ 29. Crandall spoke with the plaintiff and instructed her not to have discussions with teachers in their classrooms, but to come to the office, where he would call the teachers to come, so that they could discuss John in private. *Id*. Instead, despite the instruction, the plaintiff went to see Peskurich in her classroom. *Id*. She stood in the doorway to Peskurich's office, handed her Dr. Fagan's report, and said in an angry tone, "Make sure everybody gets this." *Id*. She pointed her finger at Peskurich and said, "I'll say this once and only once. You should all be ashamed of yourselves." *Id*. The plaintiff then left. *Id*. Peskurich was very upset and embarrassed, particularly as students and educational technicians were present. *Id*. She immediately reported the incident to Crandall, and later spoke to her union representative and Mulsow. *Id*. She made a report at the local police station and requested a protection from harassment order. *Id*. Thereafter, Crandall acted as the go-between for communications between the plaintiff and John's teachers. *Id*.

24.    After Dr. Burgess saw John, he noted that John's language-based disorder and difficulty understanding made it necessary to repeat things multiple times for John to hear them. *Id*. ¶ 32. He did not have an opinion about whether the KES program was appropriate, but noted

that any program would have to work on language at the same time as behavior. *Id*. He did not think that John should be in a program that had a purely behavioral approach, as a creative approach was necessary to increase John's compliance. *Id*. He recommended mainstreaming as much as possible. *Id*.

25. John's kindergarten and first grade speech and language therapist, Stephanie Einsiedler, believed that more speech goals should be added to the IEP. *Id*. ¶ 33. She had concerns about his refusal to complete work, even when simplified, and his general noncompliance with adult requests. *Id* She took issue with Dr. Fagan's report. *Id*.

26. John's physical therapist, Guilia Fornara, felt that having physical therapy once per week was appropriate for him. *Id*. ¶ 34. She thought that John would be better served at KES, a program in which she had worked previously. *Id*. Susan Richardson, John's occupational therapist, initially worked with him once per week in class and once outside of class. *Id*. ¶ 35. Partway through the year, she asked to stop working in the classroom because John would refuse to work with her there, saying, "You are not my teacher." *Id*. He had difficulty with transitions, multistep instructions, taking things away from other students, and leaving the classroom without permission because he was "done." *Id*.

27. The due process hearing was held before an MDOE hearing officer on September 20 and 28, and October 14 and 15, 2010. Record at 973. Sixteen witnesses testified. *Id*. The plaintiff submitted 205 pages of exhibits and the defendant submitted 610 pages of exhibits. *Id*. at 974. The plaintiff argued that the defendant improperly failed to evaluate John in all areas of suspected disability, failed to evaluate and address his behavioral needs properly, predetermined his placement while developing the May 2010 IEP, failed to include a behavioral support/intervention plan in the proposed IEP, failed to provide him with the least restrictive

educational environment, and wrongly retaliated against the defendant and John for filing a due process complaint. *Id*. at 994-95.

28.   The hearing officer found that the IEP team should have ordered a functional behavioral assessment ("FBA") and established a behavioral intervention plan ("BIP") for John, should revisit John's speech and language goals "to reflect the work Ms. Einsiedler is doing with" John; did not predetermine John's placement; that the self-contained program at KES could provide John with a free and appropriate public education ("FAPE"), but that she could not determine whether it would be the least restrictive setting for his education because he had "not been given a chance to achieve meaningful educational progress in the less restrictive environment at [KCS] with the benefit of an FBA and a BIP drafted by the IEP team for implementation there[;]" and that the defendant had not retaliated against John or the plaintiff. *Id*. at 997-1008.

29.   The hearing officer vacated the May 13, 2010, IEP and ordered the defendant to obtain an FBA "conducted by a Board Certified Behavior Analyst or similarly qualified professional as soon as possible, but no later than 45 days from the date of this decision"; to draft a BIP for John upon receipt of the FBA, to be implemented at KCS, providing that this could be done by making reasonable but limited changes to his stay-put program; to track John's behaviors, in accordance with the recommendations of the behavioral specialist, for 90 days, following which John would remain at KCS if he made reasonable documented progress in both his behavioral and educational goals, and, if not, he would be transferred to the program at KES. *Id*. at 1008-09.

30.   The plaintiff filed a motion to amend the hearing officer's decision, Record at 1020-25, which the hearing officer denied. *Id.* at 1036-8.  The defendant hired Johanne Soucy-Camire,

11

a board certified behavioral analyst, to conduct a functional behavioral assessment of John. Defendant's Exh. 2 (ECF No. 19-2).

31.   John's IEP team met on January 7, 2011.   Written Notice (ECF No. 22-1) at 1.  It agreed with Soucy-Camire's assessment and a draft Positive Behavior Support Plan prepared by Soucy-Camire and Mary McLennan.  *Id.* at 2.  It agreed to several amendments to the draft IEP. *Id.*  However, the plaintiff disagreed with the rest of the team on two points:  whether the specific teaching methodology to be used with John should be listed in the IEP, and where John should be placed.  *Id.* at 2-4.  The plaintiff wanted John to stay at KCS with a one-on-one trained educational technician to work with him.  The rest of the team believed that placement at the self-contained program at KES would be best.  *Id.*

32.   After the appeal was filed in this court, the defendant sought leave to add certain documentary evidence to the administrative record and to add testimony from Peskurich, Mulsow, Urban, and Soucy-Camire.   ECF No. 17.   The plaintiff also sought leave to file supplemental documentary evidence.  ECF No. 20.  After oral argument, I granted the plaintiff's unopposed motion and granted the defendant's motion over objection, allowing the plaintiff to take limited depositions of the four witnesses whose testimony the defendant wished to add to the record.  ECF No. 34.

## II.  Proposed Conclusions of Law

1.  A party dissatisfied with the decision of an MDOE hearing officer may appeal that decision to the Maine Superior Court or to the United States District Court.   20-A M.R.S.A. § 7207-B(2)(B); *see also* 20 U.S.C. § 1415(i)(2)(A).

2.  The IDEA provides that a court reviewing the decision of a hearing officer "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the

request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).

3.  "The role of the district court is to render bounded, independent decisions – bounded by the administrative record and additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court."  *Hampton Sch. Dist. v. Dobrowolski*, 976 F.2d 48, 52 (1st Cir. 1992) (citation and internal quotation marks omitted).  "While the court must recognize the expertise of an administrative agency, as well as that of school officials, and consider carefully administrative findings, the precise degree of deference due such findings is ultimately left to the discretion of the trial court."  *Id*. (citations and internal quotation marks omitted).

4.  The First Circuit and other courts have suggested that with respect to a hearing officer's legal conclusions, the level of deference due depends on whether the court is equally well-suited to make the determination despite its lack of educational expertise.  *See, e.g., Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 849 (6th Cir. 2004) ("Less weight is due to an agency's determinations on matters for which educational expertise is not relevant because a federal court is just as well suited to evaluate the situation.  More weight, however, is due to an agency's determinations on matters for which educational expertise is relevant.") (citations and internal quotation marks omitted); *Abrahamson v. Hershman*, 701 F.2d 223, 231 (1st Cir. 1983) (noting that while it might be "inappropriate for a district court under the rubric of statutory construction to impose a particular educational methodology upon a state[,]" court was free to construe term "educational" in IDEA "so as to insure, at least, that the state IEP [individualized education plan] provides the hope of educational benefit.").  Even as to findings of fact, the court retains the discretion, after careful consideration, "to accept or reject the findings in part or in

13

whole." *Town of Burlington v. Department of Educ.*, 736 F.2d 773, 792 (1st Cir. 1984), *aff'd* 471 U.S. 359 (1985).

5.   In IDEA cases, as in other contexts, the burden of persuasion rests on the party seeking relief.   *See, e.g., Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 51 (2005); *Dobrowlowski*, 976 F.2d at 54; *Maine Sch. Admin. Dist. No. 35 v. Mr. & Mrs. R.,* 176 F.Supp.2d 15, 23 (D. Me. 2001), (rec.dec., *aff'd* Feb, 27, 2002), *rev'd on other grounds*, 321 F.3d 9 (1st Cir. 2003) ("The party allegedly aggrieved must carry the burden of proving . . . that the hearing officer's award was contrary to law or without factual support.").

### A.  Due Process Right

6.   The plaintiff contends that the hearing officer "stripp[ed]" her of her due process right to challenge John's placement.  Parent's Brief at 13.  This contention is based on the "final two sentences of the remedial Order," which the plaintiff characterizes as "purport[ing] to resolve an issue that was not, and could not have been, raised in the hearing."  *Id.* at 14.   The final two sentences of the hearing officer's decision state:

> If the Student makes reasonable documented progress in both his behavioral and educational goals during this [initial 90-day] period, he shall remain at [KCS].  If not, then he shall transfer to the behavioral program at KES.

Record at 1009.  The plaintiff describes these sentences as resolving the question of "What should happen in the future if the new IEP and behavior intervention plan to be developed as a result of the remedial FBA and ensuing team process were to prove unsuccessful or inappropriate?"  Parent's Brief at 14.

7.  Specifically, the plaintiff asserts that "any number of disagreements could be expected to arise after entry of the [hearing officer's] order[,]" issues "which did not exist until after the hearing officer ordered [a revised IEP] to be prepared[,]" and which "obviously could not have

14

been raised or litigated at the hearing." *Id.* at 15. "Yet the final portion of the remedial order fails to acknowledge the possibility of such future disputes and the potential need for due process proceedings to resolve these disputes." *Id.* She cites no authority for the necessarily-implied proposition that failure by a hearing officer to state in his or her order that further hearings are possible means that the parents cannot seek such a hearing.

8.  The plaintiff reads the hearing officer's order to "eliminat[e] the critical stay-put right at the heart of all IDEA review procedures" "by stating that John 'must be placed at KES.'" *Id.* at 17. Under this view, the plaintiff asserts that she "would possess a right to pursue due process only if she first were to allow John to be placed in the segregated behavior room at KES." *Id.*

9.  However, as the defendant points out, the hearing officer did not state that the plaintiff was barred from challenging any decisions that were to be made by the IEP team. Defendant's Brief at 12. When the plaintiff made this argument to the hearing officer in her motion to amend the hearing officer's order, Record at 1022-25, the hearing officer denied the motion, stating, *inter alia*, that "I do not agree that the Parent is prevented from exercising her rights in the future[.]" *Id.* at 1037.

10.  The defendant contends that the plaintiff could have filed for a due process hearing after the January 2011 IEP team meeting under Maine Department of Education regulations. Defendant's Brief at 13. The plaintiff responds that, if she had done so, "it is beyond doubt that Defendant would have immediately moved to dismiss that complaint, arguing that the issue was barred by the doctrine of *res judicata* due to the terms of the Hearing Officer's remedial order. In other words, any attempt to bring such a claim would have been completely futile[.]" Plaintiff's Reply Memorandum of Law ("Parent's Reply") (ECF No. 58) at 5 n.2.

11.   Significantly, the plaintiff does not assert that any such motion to dismiss would be granted.  That is a necessary element of a successful futility argument.[2]  It is not necessary for the court to resolve this issue, however, because the plaintiff is receiving all the process that is due through the mechanism of this court appeal.  She asserts that the hearing officer's decision

> suggests that, regardless of any disagreement by Plaintiff, John's placement shall be determined based on his performance (as judged by the District) under whatever programming ultimately were to emerge from the District's attempt to comply with the hearing officer's order. The order even permitted the District to reaffirm its initial illegal decision, unilaterally and without recourse [for] the Plaintiff, and place John in the segregated behavior classroom at KES after developing a new IEP with a behavior intervention plan.

Parent's Brief at 16.

12.   The plaintiff's appeal from the hearing officer's decision has continued John's placement at KCS under the IDEA's stay-put provision, 20 U.S.C. § 1415(j), and this court has the benefit of the defendant's attempt to comply with the hearing officer's order.  The plaintiff cites no authority for the proposition that she is entitled, under any theory of due process of law, to an additional review of this information by a state-agency hearing officer before it is reviewed by this court.   After all, the requirements of the IDEA for a child's education should be

---

[2] Maine's Unified Special Education Regulations ("MUSER") provide in Section XVI.1(B)(3) that "[a] parent . . . may submit a written request for a due process hearing to the Department [of Education], after having submitted the written request first to the responding party, when there is a disagreement regarding the identification, evaluation, placement or the provision of a free appropriate education to a child."  They provide at Section XVI.4(A)(3)(b) that "[i]f an issue raised in a complaint filed under this section has previously been decided in a due process hearing involving the same parties—(i) The due process hearing decision is binding on  that issue."  The issue of the defendant's compliance with the hearing officer's order could not have been raised in the due process hearing held in September and October 2010 from which the order resulted.  Thus, there is at least a reasonable question whether the doctrine of *res judicata* would be applicable to a request for a due process hearing made after the FBA report was received, the BIP was drafted, and the IEP was amended as directed by the hearing officer's order; all of this information would be "new facts to support revisiting the findings in the prior" hearing officer's decision.  *See Theodore v. Government of the District of Columbia*, 655 F.Supp.2d 136, 140 (D.D.C. 2009); *see also Friendship Edison Public Charter Sch. Chamberlain Campus v. Suggs*, 562 F.Supp.2d 141, 144-45, 149 (D.D.C. 2008) (successive requests for due process hearing filed and considered when school failed to comply with hearing officer's decision). *See also* MUSER § XVI.4(A)(3)(c).

implemented as soon as possible, to maximize the benefit to the child, rather than being delayed by sequential administrative hearings.

13.   The title of the pertinent section of the parent's brief asserts that she was "strip[ped]" "of critical rights under the IDEA and Maine law," Parent's Brief at 15.   She cites 20 U.S.C. § 1415(j) and sections XVI.1.B and XVI.20 of the state special education regulations as the sources of these rights.   *Id*. at 15, 17.

14.   The federal statute upon which the plaintiff relies states, in relevant part: "[D]uring the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child[.]"   20 U.S.C. § 1415(j).   The issue of placement was before the hearing officer in this case, by the plaintiff's own recounting.   Parent's Brief at 13 (stating issues before the hearing officer).   If the plaintiff's argument based on the cited statute were correct, no hearing officer could ever make a decision on placement, even when the parties agreed to present that issue to the hearing officer.   All that the statute provides is an assurance that the child will stay in his current placement if and when the parent invokes the "due process" procedures provided by IDEA.   It remains within the parent's sole control to invoke this provision; all the parent has to do is file a challenge to the hearing officer's placement decision in state or federal court.   The hearing officer in this case did not, and could not, take that option away from the plaintiff.

15.   The state regulations upon which the plaintiff relies provide, in relevant part, as follows:

> Any parent, adult student or interested party may submit a written complaint to the Department . . . when there is a dispute regarding the identification, evaluation, placement or the provision of appropriate services to a child.

MUSER § XVI.1.B(1)

> [D]uring the pendency of any . . . administrative or judicial proceeding regarding a due process hearing request notice requesting a due process hearing . . . , unless the State or local agency and the parents of the child agree otherwise, the child involved in the hearing request must remain in his or her current educational placement.

MUSER § XVI.20.A (emphasis omitted).

16.   Again, the hearing officer did not and could not deprive the plaintiff of the stay-put option under MUSER.  The plaintiff had agreed that the question of placement was before the hearing officer.  After the hearing officer ruled on that issue, the dissatisfied plaintiff simply had to file an appeal in court, which she did, and John would stay in his current placement, which, from all that appears, he has done.

17.   The plaintiff has not shown that she is entitled to relief on this basis.

### B.  Improper Delegation

18.   The plaintiff next contends that the hearing officer "improperly delegate[d] remedial authority to the [defendant]."   Parent's Brief at 18-19.   This argument appears to be largely derivative of the plaintiff's first argument.   Specifically, the plaintiff says:

> [T]he [defendant] cannot be permitted . . . to take any actions it may wish in alleged compliance with the remedial order, and then rely on the challenged language in that order to justify changing John's placement to the far more restrictive self-contained behavior classroom placement at KES.   To allow this would sanction an impermissible delegation of authority by the hearing officer to the [defendant], . . . which is not [*sic*] prohibited by the IDEA.

*Id*. at 18.

19.   The defendant responds that the hearing officer merely ordered the defendant to obtain information necessary for the decision as to which placement was appropriate for John, with directions about how the information was to be used in that regard.  Defendant's Brief at 8-

12.  It correctly points out, *id*. at 11 & n.11, that two of the three cases cited by the plaintiff are inapposite, and that the plaintiff's citation of regulations governing who can serve as a hearing officer is similarly unhelpful.

20.  In both *Board of Educ. of Fayette Cty*., 478 F.3d 307 (6th Cir. 2007), and *Reid v. District of Columbia*, 401 F.3d 516 (D.C. Cir. 2005), which are cited by the plaintiff, Parent's Brief at 18-19, the courts held that a hearing officer may not give an IEP team the power to terminate a compensatory education award.  478 F.3d at 318; 401 F.3d at 526.  The Sixth Circuit cited *Reid* with approval in this regard.  478 F.3d at 318.  The hearing officer's order in the instant case does not give the IEP team the power to terminate a compensatory education award. That is a critical distinction.  This point is made in persuasive fashion by the court in *Struble v. Fallbrook Union High Sch. Dist*., No. 07cv2328-LAB (CAB), 2011 WL 291217, at *8 (S.D. Cal. Jan. 27, 2011).  *See also K.I. v. Montgomery Pub. Schs.*, 805 F.Supp.2d 1283, 1297 (M.D. Ala. 2011) (after plaintiff is properly evaluated and a new IEP created, defendant can re-revaluate her placement).  These opinions are more persuasive than that in the other case cited by the plaintiff, *Meza v. Board of Educ. of Portales Munic. Schs.*, Nos. CIV 10-0963 JB/WPL, 10-0964 JB/WPL, 2011 WL 1128876, at *13-*16 (D. N. M. Feb. 25, 2011).

21.  The plaintiff is not entitled to relief on this basis.

### C.  Hearing Officer's Authority

22.  The plaintiff's final substantive argument is that the hearing officer "d[id] not have jurisdiction or authority to issue an order that purports to determine the appropriateness of a future IEP or placement that has yet to be developed or determined when the order is issued." Parent's Brief at 20-21.  She contends that John's future placement was not "expressly raised in [the] due process complaint."  *Id*. at 20.

23.   This argument is undermined by the plaintiff's own statement of the issues submitted to the hearing officer:

> (1) "Did the [defendant] commit procedural violations in the formulation of [John's] 2010-2011 IEP and placement offer," and (2) "Are the IEP and placement for the 2010-2011 school year reasonably calculated to provide [John] with a free appropriate public education (FAPE) in the least restrictive environment?"

*Id*. at 13.   However, the plaintiff characterizes these issues as "relat[ing] only to . . . the restrictiveness of the placement where the [defendant] proposed to implement [the 2010] IEP." *Id*. at 21.   Assuming *arguendo* that her narrowing of the issue is correct and permissible under the circumstances, the plaintiff expands on this statement only by asserting that her "right to commence a due process challenge to the [defendant's] actions in implementing the remedial order . . . had to be preserved."   *Id*.   This is a restatement of her earlier argument that the hearing officer's decision wrongly deprived her of this right.   As I have already discussed, the decision did not and could not do that.   She apparently chose not to pursue this course of action, but her unilateral conclusion that it would be futile does not excuse her failure to explore the possibility that she could be wrong.

24.   The defendant does not respond separately to this argument, and the plaintiff does not return to it in her reply brief.

25.   The plaintiff here takes a position quite different from that which underlies her first two arguments.   Having contended that the hearing officer erred by allowing the defendant to determine John's placement after obtaining the necessary evaluation and amending John's IEP in compliance therewith, she now contends that the hearing officer wrongly "determine[d] future events, such as John's placement for implementation of an IEP and behavior plan yet to be created[.]"   *Id*.

26.   In any event, this argument fails as well.  The only case authority cited by the plaintiff, *Saki v. Hawai'i*, Civil No. 07-00209 JMS/LEK, 2008 WL 1912442 (D.Haw. Apr. 30, 2008), is distinguishable.  In that case, the court merely held that the hearing officer could not rule on the validity of a later IEP that was not included in the plaintiff's request for hearing, despite the fact that the defendant raised the later IEP in its answer to the notice of hearing.  *Id.* at *6 & n.7.   The plaintiff's request for a hearing in this case includes, under the heading "Description of the Issue(s)," repeated references to the defendant's proposed placement of John in the self-contained classroom at KES.  Record at 2-4.  In addition, as previously noted, the plaintiff herself states that she sought an administrative hearing in order to "challenge the appropriateness of the May 2010 IEP and the undue restrictiveness of John's proposed self-contained placement."  Parent's Brief at 6.   The hearing officer's order that the defendant implement the amended IEP that she directed it to devise, after the behavioral analysis had been completed and a BIP written "at [KCS], assuming this can be done by making reasonable but limited changes to the Student's stay-put program," Record at 1009, is well within the scope of the issues presented to the hearing officer, as is her order that, if John did not make "reasonable documented progress in both his behavioral and educational goals during [a 90-day] period," he "shall transfer to the behavioral program at KES."  *Id.*

27.  The plaintiff is not entitled to relief based on her last argument.

### D.  The Defendant's Counterclaim

28.   The defendant contends that the hearing officer's finding that it had failed to undertake an FBA and develop a BIP, which in turn required revision of John's IEP, was erroneous and that it was entitled to change John's placement to KES in May 2010.  Defendant's Brief at 14-34.  In denying the plaintiff's motion to dismiss the defendant's counterclaim, ECF

No. 13, Judge Hornby has ruled that the counterclaim is not moot and was not untimely filed. Decision and Order on Plaintiff's Motion to Dismiss the Defendant's Counterclaim (ECF No. 26).

29.   The defendant first contends that the hearing officer erred in ordering that it obtain an FBA and then write a BIP, because the law did not require these efforts, it had already undertaken such efforts, and it had already met its duty to address John's behaviors.  Defendant's Brief at 20-34.

### 1.  Legal Requirements

30.   The defendant asserts that "the only circumstance in which the state and federal law mandate use of an FBA and BIP is when the student has been suspended from school for an excessive period of time and the student's misbehavior is a manifestation of the child's disability[,]" circumstances which do not exist in this case,[3] "and the family has never asserted otherwise." *Id.* at 21.   The defendant does not address, however, the necessary corollary to this argument: that a hearing officer may not order an education provider to undertake any activity that is not expressly required by statute or regulation.   That is not a correct statement of applicable law.  *See, e.g., Mr. & Mrs. A. v. New York City Dep't of Educ.*, 769 F.Supp.2d 403, 424 n. 15 (S.D.N.Y. 2011) (compensatory education remedy not expressly authorized by IDEA but rather is creature of case law construing IDEA); *Ferren C. v. School Dist. of Philadelphia*, 595 F.Supp.2d 566, 577 (E.D.Pa. 2009) (Congress expressly contemplated that courts would fashion remedies not specifically enumerated in IDEA).

31.   The defendant also asserts that the IDEA does not require a school district to conduct an FBA "[w]hen a student's behavioral needs are otherwise addressed through supports and

---

[3] The defendant cites no record support for its suggestion the John's misbehavior is *not* a manifestation of his disability, and that fact, if indeed it is one, is not apparent in the portions of the record that I have reviewed.

interventions[.]" Defendant's Brief at 21. That statement is accurate, as far as it goes. But, it is the hearing officer's job to determine whether those needs are adequately addressed in the absence of an FBA under the circumstances of each student's case, and that is precisely what the hearing officer did in this case. The defendant takes nothing based on its argument that the hearing officer "committed legal error in finding an IDEA violation based on her perception that no FBA or BIP had been undertaken." Defendant's Brief at 21. *See generally R.K. v. New York City Dep't of Educ.*, No. 09-CV-4478 (KAM) (RLM), 2011 WL 1131522, at \*4 (E.D.N.Y. Mar. 28, 2011)(failure to obtain FBA and BIP deprived student of FAPE): *Long v. District of Columbia*, 780 F.Supp.2d 49, 61 (D.D.C. 2011) (same).

## 2. FBA and BIP Already Undertaken

32.   The defendant next contends that "the record establishes" that it "did in fact undertake an FBA and used that FBA to develop a BIP that it then implemented for John." *Id.* at 21-22. Specifically, it asserts that a report from Dr. Wojcik, a psychologist, dated October 21, 2009, is an FBA, and that Dr. Wojcik then assisted Peskurich "in developing a BIP for John." *Id.* at 22.

33.   The hearing officer rejected this argument, concluding that:

   Although Ms. Peskurich and Dr. Wojcik created a behavior plan that sought to assist the Student with his behavioral difficulties, it was not done by a behavioral expert, with the thoroughness required of an FBA, or even with any direct involvement from the IEP team. Although the plan had many interventions, it was treated in such an informal way that is was not shared with the rest of the IEP team, including the Parent, who had no knowledge of its existence, or with the classroom teacher, During the April 29, 2010 IEP meeting, the Parent asked for a written BIP and more behavior supports, and she had requested an FBA previously.  [Fact #17]  There was no explanation why no one told the Parent of the existence of Ms. Peskurich's plan at the time.  At the hearing, the plan was something of a mystery to everyone other than its creators.

Record at 999-1000.  She added, in a footnote, that:

> Although the IDEA does not state who may conduct FBAs, districts must ensure that those who do conduct them are adequately trained.  Although Dr. Wojcik testified that he has conducted an FBA or two for another district, and went to a workshop where FBAs are discussed, he was not a behavior specialist, and Ms. Peskurich had no experience in this area. [Testimony of J. Wojcik, C. Peskurich]

*Id*. at 999, n.6.

34.  I cannot agree with the defendant that the hearing officer's conclusions "elevate form over substance."  Defendant's Brief at 22.  A comparison of Dr. Wojcik's report, Record at 406-09, with that of Ms. Soucy-Camire, Exh. 2 to Deposition of Johanne Soucy-Camire (ECF No. 19-2), demonstrates the superiority of an evaluation of behavior performed by a trained behavior specialist.  In addition, a BIP that is revealed to no one other than its authors has little or no value to the IEP team that is charged with developing the means of providing a FAPE to the student involved.

35.  The hearing officer's decision on this point required specialized knowledge of the IEP process and accordingly is due substantial deference.  The defendant has not carried its burden of persuasion on this issue.

### 3. The Defendant's Duty

36.  The defendant's final argument is that it had met its duty to address John's behaviors before changing his placement.  *Id*. at 25-34.  Specifically, it avers that, because its "very significant attempts to help John succeed at [KCS]" did not work, the IEP team, with the exception of the plaintiff, "correctly determined that John's placement for the 2010-2011 school year should change to the program at KES[.]"  *Id*. at 25.  Of course, the hearing officer heard all of the testimony cited by the defendant in support of this argument and came to a different conclusion.

37.   The defendant recites, extensively, the actions taken by its employees in attempts to provide John with sufficient aids and services to allow him to control his disruptive and confrontational behaviors.  *Id.* at 25-29.  It points out that Dr. Wojcik, Cmaylo, Peskurich, and Mulsow "all testified that the options available at [KCS] had been exhausted."  *Id.* at 29.  In addition, it faults the hearing officer for failing to "indicate what other strategies [it] could have tried, apart from ordering an FBA and a BIP."  *Id.*  And it asserts that "the family does not really dispute" that John needed more extensive programming.  *Id.*

38.   The defendant cites no authority for the legal underpinnings of these arguments: that a hearing officer is required to take the word of a school district's employees that all possible options for aids and services have been provided to a particular child; that a hearing officer is required to specify the aids, services, and/or strategies that the school district has not yet tried that might be of benefit to the child; or that an agreement that more extensive programming is needed automatically means that the programming need not be provided at the child's current school and that he must be transferred to another school where the programming is available.

39.   In the absence of such authority, the hearing officer's conclusion that more evaluation of John was necessary in order to determine whether his needs could be met at KCS or whether transfer to KES was necessary does not appear to be erroneous.  As the hearing officer noted:

> Although the testing [of John] included the completion of behavior rating scales, and behavioral observations, no functional behavioral assessment has ever been done.  Additionally, although it was noted in the psychological evaluation that the Student had speech problems, there was no specific evaluation of his speech and language needs or abilities.
> * * *
> [G]iven the Student's difficulties with language and the fact that his behaviors were a major impediment to his learning, it is unclear why the [defendant] did not evaluate him in those areas.  The Student's behaviors even made it difficult to obtain accurate WISC-IV and CMS test results.

25

The IDEA requires the IEP team, "in the case of a child whose behavior impedes the child's learning or that of others, [to] consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior."  20 USC § 1414(d)(3)(B)(i).  The regulations state that a school district must consider a student's need for a BIP under these circumstances.  34 CFR 300.324(A)(2)(i).

* * *

A method often used for evaluating student behaviors to develop a BIP is the functional behavioral assessment.  FBAs are usually done in association with the removal of a student from school for behavioral reasons, and the IDEA only *requires* them in connection with serious disciplinary matters.  *See* 34 CFR 300.530(f).  This does not mean, however, that a school department cannot choose to use FBAs in situations like this one.  The general purpose of an FBA is to provide the IEP team with additional information, analysis, and strategies for dealing with problem behaviors, especially when they interfere with a child's education.

* * *

Although Ms. Peskurich and Dr. Wojcik created a behavior plan that sought to assist the Student with his behavioral difficulties, it was not done by a behavioral expert, with the thoroughness required of an FBA, or even with any direct involvement from the IEP team.  Although the plan had many interventions, it was treated in such an informal way that it was not shared with the rest of the IEP team, including the [plaintiff], who had no knowledge of its existence, or with the classroom teacher.  During the April 29, 2010 IEP meeting, the [plaintiff] asked for a written BIP and more behavior supports, and she had requested an FBA previously.  There was no explanation why no one told the [plaintiff] of the existence of Ms. Peskurich's plan at that time.

* * *

The [defendant] clearly felt that the Student's behaviors were sufficiently serious that he needed to be placed in a self-contained behavioral program.  Yet the IEP team never ordered an FBA, nor did it take a formal look at the Student's behaviors, and agree to a plan for addressing these behaviors.  Consequently, we do not know whether the Student would have experienced a greater degree of success in his educational program[] if he had had the benefit of a BIP developed in accordance with the IDEA law and rules.   This is the sort of procedural defect that, in a case like this one, could compromise the Student's right to an appropriate education, and is therefore a violation of the IDEA.

Record at 998-1000 (footnote and some citations omitted) (emphasis in original).

40.   Again, the hearing officer's expertise in this area requires the court to accord her opinion deference.   In addition, the reasoning supporting her decision is comprehensive and persuasive.   The defendant is not entitled to a declaration that none of the action that it has undertaken in accordance with the hearing officer's opinion was necessary.

### E.  Attorney Fees

41.   Finally, the plaintiff contends that she is entitled to an award of attorney fees pursuant to 20 U.S.C. § 1415(i)(3)(B)(i)(I) because, "[a]s a result of the administrative proceedings, [she] received significant relief that materially altered the legal relationship of the parties." Parent's Brief at 23.  The defendant responds only that "[t]his claim is not yet ripe and will not be addressed here[.]"  Defendant's Brief at 7 n.9.  It notes that it "disputes the family's assertion that they are the prevailing party in this case[,]" *id.*, but offers nothing more specific and no citation to authority.

42.   If the court adopts these recommended factual findings and conclusions of law, the plaintiff will not be able to contend that she is the prevailing party in this court.  The statutory section cited by the plaintiff does allow the award of reasonable attorney fees to the prevailing party in a dispute under the IDEA.  However, as this court has noted, "[a]ccording to First Circuit precedent, in order to be a 'prevailing party' in IDEA litigation, there must be a 'material alteration of the legal relationship of the parties,' and there must be a 'judicial imprimatur on the change.'"  *Mr. C v. MSAD 6*, Civil No. 6-198-P-H, 2008 WL 2609362, at * 1 (D. Me. June 25, 2008) (citations omitted).

43.   There is as yet no "judicial imprimatur" on any material alteration of the legal relationship of the parties in this case and, therefore, the request for an award of attorney fees is premature.

### III.  Conclusion

For the foregoing reasons, I recommend that the plaintiff's appeal and the defendant's counterclaim be **DENIED.**


### *NOTICE*


*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within fourteen (14) days after being served with a copy thereof.   A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.*


*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*


Dated this 31st day of July, 2012.


/s/  John H. Rich III.
John H. Rich III
United States Magistrate Judge