UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JANE DOE, individually as parent and next friend of JOHN DOE, a minor, | ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | No. 2:11-cv-25-DBH |
| REGIONAL SCHOOL UNIT NO. 21, | ) ) ) | |
| Defendant | ) | |

### MEMORANDUM DECISION AND ORDER ON MOTION TO DISQUALIFY COUNSEL

The defendant, Regional School Unit No. 21 ("RSU No. 21"), moves to disqualify the plaintiff's counsel, Richard O'Meara, Esq., and the law firm of Murray Plumb & Murray ("Murray Plumb"), on the ground that O'Meara and Murray Plumb have an irresolvable conflict of interest in representing the plaintiff's interests adverse to RSU No. 21.  *See* Defendant's Motion To Disqualify Plaintiff's Counsel ("Motion") (ECF No. 76) at 1.  For the reasons that follow, the Motion is denied.[1]

### I.  Applicable Legal Standards

"[T]he district court has the duty and responsibility of supervising the conduct of attorneys who appear before it."  *Kevlik v. Goldstein*, 724 F.2d 844, 847 (1st Cir. 1984).  This court has adopted, "as its standard for professional conduct[,] the Maine Rules of Professional Conduct adopted by the Supreme Judicial Court of Maine, as amended from time to time by that Court."  Loc. R. 83.3(d).

> In Maine, the Law Court has held that disqualification of an attorney is appropriate only where the moving party produces evidence supporting two

---

[1] "A motion to disqualify counsel is a non-dispositive pretrial motion on which a Magistrate Judge may enter a decision, rather than merely recommend a decision."  *Perkins v. Rieser*, No. 3:07-cv-325, 2012 WL 1606657, at *1 (S.D. Ohio May 8, 2012) (citing 28 U.S.C. § 636(b)).

1

> findings: (1) "continued representation of the nonmoving party by that party's chosen attorney results in an affirmative violation of a particular ethical rule" and (2) continued representation by the attorney would result in "actual prejudice" to the party seeking that attorney's disqualification. *Morin v. Maine Educ. Ass'n*, 993 A.2d 1097, 1100 (Me. 2010). As the party moving for disqualification, Defendant "has the burden of showing the grounds for disqualification." *Casco N. Bank v. JBI Assocs. Ltd.*, 667 A.2d 856, 859 (Me. 1995). Any order disqualifying an attorney must include "express findings of that ethical violation and resulting prejudice." *Morin*, 993 A.2d at 1100.

*Concordia Partners, LLC v. Ward*, No. 2:12-cv-138-GZS, 2012 WL 3229300, at *1 (D. Me. Aug. 6, 2012).

RSU No. 21 invokes Maine Rules of Professional Conduct 1.9(a), 1.9(b), and 1.10(a) as grounds for the disqualification of O'Meara and Murray Plumb. *See* Motion at 5-10. Rule 1.9 provides, in relevant part:

> (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.
>
> (b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client
>
>> (1) whose interests are materially adverse to that person; and
>>
>> (2) about whom the lawyer had acquired information protected by Rule 1.6 and 1.9(c) that is material to the matter unless the former client gives informed consent, confirmed in writing.

Me. Rules of Prof'l Conduct R. 1.9.[2] Rule 1.10(a) provides:

---

[2] Rule 1.6 provides, in relevant part: "A lawyer shall not reveal a confidence or secret of a client unless . . . the client gives informed consent[.]" Me. Rules of Prof'l Conduct R. 1.6(a). "As used in Rule 1.6, 'confidence' refers to information protected by the attorney-client privilege under applicable law, and 'secret' refers to other information relating to the representation if there is a reasonable prospect that revealing the information will adversely affect a material interest of the client or if the client has instructed the lawyer not to reveal such information." *Id*. 1.6(d). Rule 1.9(c) provides: "A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter: (1) use confidences or secrets of a former client to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when (*continued on next page*)

2

> While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9, unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm.

*Id*. 1.10(a).

## II.  Factual Background

Eric Herlan, Esq., has worked as an attorney at the law firm of Drummond Woodsum & MacMahon ("Drummond Woodsum") since 1988. Affidavit of Eric R. Herlan, Esq. ("First Herlan Aff.") (ECF No. 76-1), attached to Motion, ¶ 1. His practice involves representation of public school units in Maine, and he has done extensive work over the years representing public school units in the area of special education. *Id*.

Beginning in the summer of 2010, Herlan represented, and served as lead counsel for, RSU No. 21 on special education issues involving student John Doe, who is the subject matter of the instant case. *Id*. ¶ 2. This included representing RSU No. 21 in preparation for and at a special education administrative hearing regarding John Doe in the fall of 2010 and on appeal to this court of that administrative hearing decision. *Id*. The representation also included advising RSU No. 21 on legal issues surrounding ongoing programming determinations that were required to be made about this student during the course of legal proceedings. *Id*. The instant action was filed on January 20, 2011. ECF No. 1. Herlan and Peter Felmly, Esq., also of Drummond Woodsum, entered their appearances on behalf of RSU No. 21 and filed an answer and counterclaim challenging the decision of the administrative hearing officer. Declaration of Richard L. O'Meara ("O'Meara Decl.") (ECF No. 80-2), attached to Plaintiff's Objection to Defendant's Motion To Disqualify Plaintiff's Counsel ("Objection") (ECF No. 80), ¶ 4.

---

the information has become generally known; or (2) reveal confidences or secrets of a former client except as these Rules would permit or require with respect to a client." *Id*. 1.9(c).

3

With the filing of RSU No. 21's surreply memorandum of law on March 13, 2012, ECF No. 61, counsel of record completed briefing of the merits of the claims and counterclaims in this action. On July 31, 2012, I issued recommended findings of fact and conclusions of law. ECF No. 66. The parties filed partial objections to portions of my recommended decision on August 10 and August 17, 2012, respectively, ECF Nos. 70-71, followed by responses that were filed on August 27 and September 4, 2012, respectively, ECF Nos. 72-73. On September 4, 2012, the court scheduled oral argument on the objections for October 24, 2012. ECF No. 74. The court has postponed oral argument pending decision of the instant motion. ECF No. 77.

Sara Hellstedt, Esq., was employed as an associate at Drummond Woodsum from October 2007 to August 23, 2012, when she left the firm for personal reasons. Declaration of Sara S. Hellstedt, Esq. ("Hellstedt Decl.") (ECF No. 80-1), attached to Objection, ¶ 2. She has worked as an associate at Murray Plumb since September 10, 2012. *Id.* ¶ 1.

Hellstedt was not, nor had she ever been as of November 2, 2012, a member of the Bar of the U.S. District Court for the District of Maine. *Id.* ¶ 3. Since joining Murray Plumb, she has submitted an application for admission that has been approved, and she was due to be sworn in as a member of the federal court Bar on December 19, 2012. *Id.*[3]

While at Drummond Woodsum, Hellstedt assisted Herlan in preparing a post-hearing memorandum in the administrative process and then worked extensively on the legal work for managing the instant appeal, working under Herlan's supervision and control at all times. First Herlan Aff. ¶ 3.[4] At the administrative hearing level, Hellstedt neither communicated with, nor

---

[3] The court takes judicial notice that Hellstedt was sworn in as a member of this court's Bar on December 19, 2012.
[4] Hellstedt states that she had "absolutely no involvement" with this dispute at the administrative hearing level. Hellstedt Decl. ¶ 5. However, Drummond Woodsum's billing records indicate that, on October 27 and 28, 2010, she did research "in preparation for post-hearing memorandum." Invoice dated November 16, 2010 (ECF No. 83-2), Exh. 1 to Second Affidavit of Eric R. Herlan, Esq. ("Second Herlan Aff.") (ECF No. 83-1), attached to Defendant's Reply in Further Support of Motion To Disqualify ("Reply") (ECF No. 83).

4

provided legal consultation to, anyone from RSU No. 21. Hellstedt Decl. ¶ 5. She did not review the file. *Id.*[5] She did not attend the hearing or confer with Herlan about the case during this period of time. *Id.* On November 13, 2010, Hellstedt went on maternity leave and did not return to Drummond Woodsum until May 5, 2011. *Id.* ¶ 6. During her maternity leave, she did no work for Drummond Woodsum. *Id.*

In the summer of 2011, Herlan asked Hellstedt to assist him with RSU No. 21's appeal of the hearing officer's decision in this case. *Id.* ¶ 7. Hellstedt billed 142.70 hours working directly on this appeal. First Herlan Aff. ¶ 4. She did extensive work researching legal issues, reviewing the hearing transcript and records from the hearing in depth, and preparing many of the initial drafts and later revisions to submissions prepared for this court. *Id.*[6]

Although Hellstedt does not have access to her billing records, her memory is that the vast majority of her billable time involved reviewing the thousands of pages of administrative record prepared and filed by the Maine Department of Education ("MDOE"). Hellstedt Decl. ¶ 8. Herlan asked her to familiarize herself with the entire record and to prepare a detailed index of the hearing transcript, which was hundreds of pages long. *Id.* He then instructed her to review the written submissions that he had prepared and submitted during the administrative proceedings and to update the factual citations therein to reflect the numbering in the record as filed by the MDOE. *Id.* This was a tedious and time-consuming process that, in Hellstedt's view, could have been accomplished by a paralegal. *Id.*

---

[5] Hellstedt also states that she did not have access to the file. Hellstedt Decl. ¶ 5. However, Herlan avers that Drummond Woodsum rarely limits attorney access to client files on its file server, and all RSU No. 21 client files in this matter are available to all attorneys on the file system. Second Herlan Aff. ¶ 4.

[6] Hellstedt does not recall preparing the initial draft of any court submissions. Hellstedt Decl. ¶ 11. She recalls that Herlan or Felmly prepared the initial drafts and then instructed her to revise them by inserting text, including citations and legal arguments based on the research that she had been asked to conduct. *Id.* However, Drummond Woodsum's billing records indicate that Hellstedt worked on drafting, revising, and finalizing the appellate brief filed in this case. Invoice dated March 17, 2012 (ECF No. 83-4), Exh. 3 to Second Herlan Aff.

At certain points during the litigation, Herlan directed Hellstedt to conduct legal research on certain narrow issues of the law. *Id.* ¶ 10. She believes that the results of this research were used to bolster arguments that Herlan was advancing in his court submissions. *Id.* Herlan also instructed Hellstedt to locate string citations in support of certain legal arguments that he was advancing. *Id.* Drummond Woodsum's billing records reflect that Hellstedt invested at least 18 hours researching the stay-put issue in this case. Invoices dated October 27, 2011 (ECF No. 83-3), March 17, 2012 (ECF No. 83-4), Exhs. 2-3 to Second Herlan Aff.

Herlan states that he and Hellstedt had a number of discussions regarding RSU No. 21's case strategy on appeal and the strengths and weaknesses of various arguments that were or could be a part of the appeal. First Herlan Aff. ¶ 5. In addition, according to Herlan, they spoke a number of times regarding the status of the student at school during the course of the proceedings under the "stay put" provision of state and federal law and regarding a number of options through which the child's placement might be altered to address his needs. *Id.* This included discussion of information that the client had provided Herlan regarding difficulties that the student was encountering in his stay put placement and some of the staffing challenges resulting from that placement. *Id.* Herlan adds that he and Hellstedt also discussed some of the special circumstances presented by the person who served as the student's special education teacher during the 2010-11 school year, information that was provided to Herlan by RSU No. 21 officials. *Id.* Hellstedt and Herlan also discussed the views of the Superintendent of Schools regarding the handling of the case as it proceeded. *Id.* In Herlan's view, the substance of these discussions was confidential attorney client information. *Id.*

Hellstedt recalls discussing the case with Herlan from time to time over the course of several months, but has no recollection of receiving any information that would qualify as

6

involving a client confidence or secret. Hellstedt Decl. ¶ 12. Apart from discussing a particular individual's testimony at the hearing, which was available to both sides in the dispute, she has no recollection of discussing with Herlan any "special circumstances" presented by the student's special education teacher during the 2010-11 school year. *Id*. ¶ 13. She does recall Herlan telling her that the Superintendent of Schools was "angry" and "mad at his staff" because RSU No. 21 did not prevail at the administrative hearing, but she viewed this as a natural and expected reaction from the losing party in a litigated case, as opposed to a client confidence. *Id*. She has no recollection of any other conversation with Herlan about the superintendent's position with regard to the handling of this case. *Id*.

Hellstedt states that "at no time" during her work on this case did she ever communicate with anyone from RSU No. 21, whether in person or by telephone or by email. *Id*. ¶ 9. She has no recollection of ever being copied on communications between Herlan and anyone at RSU No. 21. *Id*. She did not attend the IEP team meeting referenced in Herlan's affidavit and has no recollection of even being aware that it had occurred. *Id*. She has no recollection of ever meeting or communicating with Susan Mulsow, RSU No. 21's special education director, with regard to this or any other matter. *Id*. However, Drummond Woodsum's billing records reflect that on November 22, 2011, Hellstedt reviewed special education policies for necessary updates and drafted an email to "Ms. Muslow" regarding the same, and on January 18, 2012, she drafted an email to "Ms. Muslow" attaching referral and pre-referral policies. Invoices dated December 8, 2011, and February 13, 2012 (ECF No. 83-6), Exh. 5 to Second Herlan Aff.

As part of the process of interviewing Hellstedt, Murray Plumb inquired of her concerning her involvement with pending matters for which Drummond Woodsum served as opposing counsel. O'Meara Decl. ¶ 5. Murray Plumb learned that Hellstedt had done some

7

work on this case several months after it had been filed in federal court, although she was not a member of the Bar of this court and had never entered an appearance in the action. *Id.* ¶ 6. She explained, as described in her declaration, that the work she performed generally consisted of indexing the lengthy administrative record and hearing transcript, inserting factual citations from the record into the briefs, and conducting some targeted research for use in submissions to this court. *Id.* She further informed Murray Plumb that she had no communication with anyone representing RSU No. 21 and no knowledge of any information that she considered to be secrets or confidences as defined in Rule 1.6 of the Maine Rules of Professional Conduct. *Id.*

As part of its due diligence, Murray Plumb contacted the office of Maine Bar Counsel for advice on interpretation of Rule 1.9 and had multiple telephone conversations with Maine's Associate Bar Counsel. *Id.* ¶ 7. Murray Plumb was advised by Bar Counsel that, under a reasonable interpretation of Rule 1.9, the type of "back office" work in which Hellstedt had engaged in connection with this action did not constitute "representation" of the client as defined in Rule 1.9(a). *Id.* Bar Counsel advised that any conflict of interest analysis should be conducted under Rule 1.9(b), with the focus on whether Hellstedt had any actual knowledge of any confidences or secrets of her former firm's client, RSU No. 21. *Id.* Because Hellstedt had assured Murray Plumb that she had no actual knowledge of client confidences or secrets of RSU No. 21 and did not recall gaining any such knowledge during the course of her work, Murray Plumb concluded that her joining the firm would not create a conflict of interest that would jeopardize its continued representation of the plaintiff in this action. *Id.*

After Hellstedt left Drummond Woodsum, on Drummond Woodsum's advice, RSU No. 21 hired Bryan Dench, an attorney at a different law firm and a recognized expert on attorney ethics issues, to advise it concerning potential conflict issues. First Herlan Aff. ¶ 6. Dench's

8

understanding, based on conversations with Herlan and Mulsow and a review of billing records, was that:

> Beginning in June 2011 attorney Hellstedt worked in close association with attorney Herlan on the case, recording more than 140 hours of time before her departure in August 2012, some 14 months later. She participated in the analysis of the case and developing the client's theory of the case. Her time entries reflect, among other things, work on analysis and preparation of case strategy.
>
> She participated in drafting of appellate briefs, research and analysis into the facts of the case, discussions of case strategy and tactics, and discussion of information about the elementary [school] student who is the subject of the case, about the teacher in the student's current placement, and about the special education administration. In the course of performing her work, she received and reviewed information communicated to your firm by the client, RSU 21, for purposes of the case and in confidence. She spent many hours reviewing hearing transcripts and depositions. She learned facts communicated to counsel by the client and about the client and RSU 21 administrators and personnel that were important to tactical decisions in the case and revealed its strengths and weaknesses from the client's perspective.

Letter dated October 4, 2012, from Bryan M. Dench to Benjamin Marcus, Esq. ("Dench Letter") (ECF No. 76-2), Exh. 1 to First Herlan Aff., at 1-2. Dench concluded these facts created a clear conflict of interest for Hellstedt and, by imputation, for Murray Plumb pursuant to Maine Rule of Professional Conduct 1.9(b), and implicated her responsibilities pursuant to Rule 1.9(c). *See id*. at 2.[7] Dench discussed this with RSU No. 21, which was unwilling to consent to Murray Plumb's continued representation adverse to RSU No. 21. *Id*. at 3-4. Drummond Woodsum requested that Murray Plumb withdraw from representing the plaintiff, but received no confirmation that Murray Plumb was willing to do so. First Herlan Aff. ¶ 7.

Out of an abundance of caution, Murray Plumb instructed Hellstedt to have no contact with any of Murray Plumb's pending matters with respect to which Drummond Woodsum serves

---

[7] Dench stated that, on its face, paragraph (a) of Rule 1.9 would be violated by Hellstedt's representation of the adverse party. Dench Letter at 3 n.2. He added that "[i]t appears, however, that when a lawyer moves from one firm to another, the situation is governed by Rule 1.9(b). Rule 1.10, Comment [2]." *Id*.

as opposing counsel.  O'Meara Decl. ¶ 11.  Murray Plumb has excluded Hellstedt from all communications within the firm related to these cases.  *Id*.  She has had no contact whatsoever with this case other than to review the affidavit filed by Herlan and draft her declaration in response.  *Id*.; Hellstedt Decl. ¶ 14.

### III. Discussion

#### A. Parties' Arguments

RSU No. 21 contends that, when Hellstedt left Drummond Woodsum and joined Murray Plumb, "she effectively switched sides in this case." Motion at 5.  It reasons that:

1.	Rule 1.9(a), on its face, prohibits Hellstedt from representing the plaintiff because she formerly represented RSU No. 21 in the same action.  *See id*. at 6-7 & n.2.

2.	Rule 1.9(b), which also applies when a lawyer moves from one firm to another, prohibits Hellstedt from representing the plaintiff because she can be presumed from the circumstances to have acquired confidences or secrets of RSU No. 21 and, in any event, RSU No. 21 demonstrates that she did in fact acquire such information, namely, case strategy, including the strengths and weaknesses of various arguments that could be made on appeal, and confidential information that the client had provided Herlan, including challenges for both the student and school staff in his stay put placement.  *See id*. at 7-10.

3.	RSU No. 21 declines to consent to Hellstedt's representation.  *See id*. at 4-5.

4.	In these circumstances, Rule 1.10 prohibits O'Meara and Murray Plumb from representing the plaintiff.  *See id*. at 7.  The fact that Murray Plumb has taken steps to screen Hellstedt from contact with this case is immaterial; in Maine, such screening does not avoid the need to obtain consent.  *See id*. at 10 n.5.

The plaintiff responds that:

1.	To be entitled to disqualify Murray Plumb as the plaintiff's counsel, RSU No. 21 must meet the strict two-part test laid out by the Law Court in *Morin*, which requires that a movant demonstrate not only an affirmative violation of an ethical rule but also that the continued representation would result in actual prejudice to the movant.  *See* Objection at 8-10.

2.	RSU No. 21 fails to demonstrate any affirmative violation of Rule 1.9(a).  As Bar Counsel advised Murray Plumb, Rule 1.9(a) is inapplicable in these circumstances because Hellstedt did not represent RSU No. 21.  *See id*. at 10-11.  She was not a member of the Bar of this court, never entered an appearance on behalf of RSU No. 21, had no role in administrative proceedings before the MDOE, and primarily performed "back office" tasks, notably reviewing and indexing the voluminous record, at the direction of Herlan, one of RSU No. 21's two counsel of record in this action.  *See id*.

3.	RSU No. 21 fails to demonstrate any affirmative violation of Rule 1.9(b).  The Maine Reporter's Notes to the rule make clear that "[i]n the departing lawyer context, knowledge of confidences and secrets by some members of a firm is not *per se* imputed to the departing lawyer[,]" and a departing attorney must have "actual knowledge of information protected by Rules 1.6 and 1.9(c)."  *Id*. at 12 (quoting Me. Rules of Prof'l Conduct R. 1.9 notes, ¶¶ 7, 9).  While at Drummond Woodsum, Hellstedt had no direct communication with any representative of RSU No. 21.  *See id*. at 13.  To the extent that she is alleged to have received confidential information about legal strategy to be employed in this action, it no longer constitutes a material client confidence because both sides have executed their strategies through the preparation and filing of briefs with the court.  *See id*. at 13-14.  While Hellstedt recalls being informed that the superintendent was unhappy about having lost the administrative hearing, that is not a client confidence or secret, and she has no recollection of being apprised of any client communications

that would qualify as such. *See id*. at 14. She, therefore, lacks actual knowledge of any client confidence or secret. *See id*.

    4.    In any event, RSU No. 21 fails to demonstrate actual prejudice, and it is difficult to see how it could. *See id*. at 14-17. Hellstedt did not join Murray Plumb until after both sides had briefed their partial objections to the recommended decision in this case. *See id*. at 15. Even if Hellstedt did possess actual knowledge of any client confidence or secret, it is difficult to see how such knowledge could have any materially prejudicial impact on the case at this late juncture. *See id*. In addition, although the Maine rules do not contain the so-called "screening" provision found in Rule 1.10(a)(2) of the American Bar Association's Model Rules of Professional Conduct, Murray Plumb took affirmative steps to insulate Hellstedt from all contact with pending cases with respect to which Drummond Woodsum serves as opposing counsel, further minimizing any risk of actual prejudice to RSU No. 21. *See id*. at 16-17.

    RSU No. 21 counters that the plaintiff's reliance on *Morin* is misplaced in that (i) federal common law, rather than Maine law, governs for purposes of the standard for disqualification, and, (ii) in any event, both *Morin* and *Concordia Partners,* in which this court applied the *Morin* standard, are distinguishable in that they did not involve a breach of a lawyer's duty of loyalty to a client. *See* Reply at 2-3 & nn.2-3.[8]

    It further argues that, (i) for purposes of Rule 1.9(a), Hellstedt was indeed its lawyer, doing much more than mere "back office" work, *see id*. at 3-6, and (ii) for purposes of Rule 1.9(b), she had actual knowledge of material client confidences and secrets, both in the form of

---

[8] RSU No. 21 advocates for the application of the test for disqualification laid out in *Kevlik*. *See* Reply at 2; *Kevlik*, 724 F.2d at 851 ("[T]he former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney previously represented him, the former client. The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation. It will not inquire into their nature and extent.") (citation and internal quotation marks omitted).

the superintendent's reaction to litigation, which was impermissibly disclosed both to Murray Plumb and in the plaintiff's opposition to the instant motion, and in the form of her knowledge of case strategy, which is still material given that oral argument has been requested, one or both parties may appeal the court's ultimate decision, and there is always the potential for the parties to engage in settlement negotiations, *see id*. at 6-7.  It adds that any "screen" set up by Murray Plumb clearly has been ineffective, Hellstedt having already revealed a client confidence, and it should not be forced to endure any further prejudice or threat of improper disclosure in this case. *See id*. at 7.

### B.  Analysis

#### 1.  Applicability of *Morin* Test

This motion turns on the threshold question of the applicability of the *Morin* framework.  I conclude that *Morin* does apply.  This court has adopted "as its standard for professional conduct the Maine Rules of Professional Conduct adopted by the Supreme Judicial Court of Maine, as amended from time to time by that Court."  Loc. R. 83.3(d).  In turn, it has applied the standard for disqualification of attorneys set forth by the Law Court.  *See, e.g., Concordia Partners*, 2012 WL 3229300, at *1; *Clean Invs., LLC v. DiSanto*, 489 F. Supp.2d 100, 101-02 (D. Me. 2007); *Kuniegel v. Elgin Techs., Inc*., 196 F.R.D. 4, 5-6 (D. Me. 2000).

It is true that neither *Morin*, *Concordia Partners*, nor a third case applying the *Morin* standard, *Liberty v. Bennett*, 2012 ME 81, 46 A.3d 1141, concern an asserted violation of Rule 1.9(a).  *See Concordia Partners*, 2012 WL 3229300, at *1; *Liberty*, 2012 ME 81, ¶¶ 20-21, 46 A.3d at 1146; *Morin*, 2010 ME 36, ¶ 6, 993 A.2d at 1099.  On the other hand, no case holds that the *Morin* rubric does not apply when the duty of loyalty is at stake, and the Law Court, in

13

*Morin*, did not tether its test to the type of ethics violation alleged. To the contrary, it broadly stated:

> To guard against such abuse [the use of disqualification motions for tactical advantage], we have said that disqualification is appropriate only when the moving party produces evidence supporting two findings. First, disqualification must serve the purposes supporting the ethical rules. A party moving to disqualify an attorney has the burden of demonstrating more than mere speculation that an ethics violation has occurred; she must establish in the record that continued representation of the nonmoving party by that party's chosen attorney results in an affirmative violation of a particular ethical rule. . . .
>
> Second, we require a showing that continued representation by the attorney would result in actual prejudice to the party seeking that attorney's disqualification. . . . A mere general allegation that the attorney has some confidential and relevant information he gathered in the previous relationship will not support disqualification. Rather the moving party must point to the specific, identifiable harm she will suffer in the litigation by opposing counsel's continued representation. . . .
>
> Moreover, if the moving party produces evidence of both an ethical violation and actual prejudice, any court order disqualifying the attorney must include express findings of that ethical violation and resulting prejudice. In the absence of such findings, we will uphold the attorney disqualification only if both the ethical violation and the prejudice to be suffered are obvious from the record.

*Morin*, 2010 ME 36, ¶¶ 9-11; 933 A.2d at 1100 (citations and internal quotation marks omitted).

Accordingly, the *Morin* framework appropriately is applied here.

### 2. Showing of Ethical Violation

I conclude that (i) RSU No. 21 fails to establish an affirmative violation of Rule 1.9(b), (ii) the question of whether it has established an affirmative violation of Rule 1.9(a) is a close one, and, (iii) regardless, RSU No. 21 fails to demonstrate actual prejudice, rendering disqualification inappropriate.

#### a. Rule 1.9(b)

As the plaintiff observes, *see* Objection at 12-13, Rule 1.9(b) is implicated only when a departing lawyer has actual knowledge of a client confidence or secret, *see* Me. Rules of Prof'l

Conduct R. 1.9 cmt. [5] (Rule 1.9(b) "operates to disqualify the lawyer only when the lawyer involved has actual knowledge of information protected by Rules 1.6 and 1.9(c)"). In addition, "[i]n the departing lawyer context, knowledge of confidences and secrets by some members of a firm is not *per se* imputed to the departing lawyer." Me. Rules of Prof'l Conduct R. 1.9 notes, [¶ 8].

The record indicates that Hellstedt has actual knowledge of (i) the superintendent's reaction to the adverse administrative hearing decision, and (ii) case strategy discussions.[9] However, the plaintiff contests that the superintendent's reaction, as conveyed to Hellstedt by Herlan, qualifies as a client confidence or secret, and that any case strategy discussions of which Hellstedt may have knowledge are "material to the matter[.]" *See* Objection at 13-14 (quoting Me. Rules of Prof'l Conduct R. 1.9(b)(2)).

With respect to the superintendent's reaction, the Law Court has recognized that "[c]onfidential information may encompass more than direct communications from the client" and "could include information concerning a client's ability to deal with the stress of litigation, or serious financial difficulties that would affect the client's ability to litigate." *Adam v. Macdonald Page & Co.*, 644 A.2d 461, 464 (Me. 1994). Nonetheless, as Judge Hornby has

---

[9] As RSU No. 21 points out, *see* Motion at 7 n.4, actual knowledge can be inferred from the facts and circumstances, *see* Me. Rules of Prof'l Conduct R. 1.9 cmt. [6] ("Application of paragraph (b) depends on a situation's particular facts, aided by inferences, deductions or working presumptions that reasonably may be made about the way lawyers work together. A lawyer may have general access to files of all clients of a law firm and may regularly participate in discussions of their affairs; it should be inferred that such a lawyer in fact is privy to all information about all the firm's clients. In contrast, another lawyer may have access to the files of only a limited number of clients and participate in discussions of the affairs of no other clients; in the absence of information to the contrary, it should be inferred that such a lawyer in fact is privy to information about the clients actually served but not those of other clients. In such an inquiry, the burden of proof should rest upon the firm whose disqualification is sought."). RSU No. 21 argues that the fact that all of its files were available to all attorneys on the file system at Drummond Woodsum cuts in favor of drawing an inference that Hellstedt had actual knowledge of client confidences or secrets. *See* Reply at 4 n.4. Yet, Hellstedt denies that she ever reviewed the file, *see* Hellstedt Decl. ¶ 5, overcoming any such inference.

observed, this does not necessarily mean that a client's reaction to litigation qualifies as a confidence or secret:

> On how DiSanto defends himself in litigation, it is true that *Adam* says that relevant, confidential information 'could include information concerning a client's ability to deal with the stress of litigation.' I conclude that the operative word is 'could,' and that the Law Court was referring to something unique or peculiar (and confidential), not the ordinary reactions people have to being sued. In only the previous paragraph, the Law Court had pointed out that motions for disqualification 'can be abused as a litigation tactic.' There is no suggestion that *Adam's* brief reference to the 'stress of litigation' was designed to be a blanket pronouncement that a lawyer can never in the future appear against a previous client if the lawyer has once observed the client in a litigation setting. Something more is required than an assumption that representing a client 'necessarily' imparts confidential information about ability to 'deal with the stress of litigation.' DiSanto has not provided a sufficient basis for concluding that Attorney Libby has acquired confidential information about his ability to deal with such stress.

*DiSanto*, 489 F. Supp.2d at 102 (citations and footnote omitted). Judge Hornby held that DiSanto fell short of making the requisite showing to disqualify Libby from representing his opponent in an unrelated matter when he demonstrated only that he had spoken freely with Libby about litigation strategies and tactics and possibilities for settling the case, and that Libby had the opportunity to observe and interact with him regarding his reaction to the litigation process and the effect that it was having upon him. *See id*. at 102 n.4 ("Those statements are insufficient to meet the *Adam* standard. *Adam* held that 'the former client has the burden to show that the attorney *actually acquired* information that is both confidential and relevant to the second action, or that would give the second client an advantage in the action against the former client.'") (citations and internal quotation marks omitted) (emphasis added by Judge Hornby).[10]

---

[10] Subsequent to the issuance of *DiSanto*, the Law Court adopted the Maine Rules of Professional Conduct, effective August 1, 2009. *See Fiber Materials, Inc. v Subilia*, 2009 ME 71, ¶ 35, 974 A.2d 918, 929 (Alexander, J., concurring). However, the Maine Reporter's Notes continue to indicate that a client's reaction to the stress of litigation is not necessarily confidential. *See* Me. Rules of Prof'l Conduct R. 1.9 notes, [¶ 4] ("Using information about . . . a former client's financial difficulties or a client's ability to weather the stress of litigation, may very well (*continued on next page*)

16

In this case, from all that appears, Hellstedt never personally interacted with or observed the superintendent. She merely learned from Herlan that the superintendent was "angry" and "mad at his staff" because RSU No. 21 did not prevail at the administrative hearing. Hellstedt Decl. ¶ 13. She says that she views this as a natural and expected reaction from the losing party in a litigated case rather than a client confidence, *see id*., and I agree that it is appropriately characterized as such. There was nothing unique or peculiar in the superintendent's reaction as conveyed to Hellstedt by Herlan.

With respect to case strategy, the plaintiff argues that any confidential information that Hellstedt received about legal strategy to be employed in this action no longer is material in that both sides have executed their strategies through the preparation and filing of briefs with the court. *See* Objection at 13-14. She notes that "[i]nformation that has been disclosed to the public or to other parties adverse to the former client ordinarily will not be disqualifying." *Id*. at 14 n.2 (quoting Model Rules of Prof'l Conduct R.1.9 cmt. [3]). In response, RSU No. 21 points out that this case is still pending, oral argument has been requested, and there is a potential for an appeal or even settlement negotiations. *See* Reply at 7. It reasons that "[t]he confidential information that Attorney Hellstedt has already improperly disclosed could factor significantly into the parties' strategies going forward[.]" *Id*. Yet, it does not explain how. As discussed above, RSU No. 21 falls short of showing that Hellstedt has already disclosed a client confidence or secret. It does not demonstrate that Hellstedt acquired any case strategy knowledge that is not already apparent in its briefs or explain how any such knowledge could make a material difference with respect to oral argument, any appeal, or any settlement negotiations.

---

materially advance the current client's position in a subsequent adverse matter – even if the matters involve different transactions, facts or legal disputes.").

For all of these reasons, RSU No. 21 falls short of demonstrating an affirmative violation of Rule 1.9(b).

### b.  Rule 1.9(a)

The question of whether RSU No. 21 has made a sufficient showing of an affirmative violation of Rule 1.9(a) is a closer one.  An attorney-client relationship is established when "(1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance."  *Board of Overseers of Bar v. Mangan*, 2001 ME 7, ¶ 9, 763 A.2d 1189, 1192-93 (citations and internal quotation marks omitted).

The plaintiff argues that Hellstedt never personally represented RSU No. 21 but, rather, merely performed "back office" work.  *See* Objection at 10-11.  She emphasizes that Hellstedt never entered an appearance on behalf of RSU No. 21, had no communications with RSU No. 21 representatives, and devoted a considerable portion of the time that she spent on this case to reviewing and indexing the lengthy administrative record and hearing transcript.  *See id.*

Nonetheless, Hellstedt billed more than 140 hours working with Herlan on this matter, discussed case strategy with him, performed legal research, and drafted and/or revised briefs filed with this court.  *See* First Herlan Aff. ¶¶ 4-5.  In addition, Hellstedt did email Ms. Mulsow, RSU No. 21's special education director, on two occasions, although it is not clear that those emails concerned the instant case, *versus* a general policy review and update.  *See* ECF No. 83-6.  In these circumstances, it is a stretch to conclude that Hellstedt did not represent RSU No. 21.  C*ompare, e.g., Fematt v. City of Chicago*, No. 11 CV 1530, 2012 WL 1681990, at *4 (N.D. Ill. May 9, 2012) (for purposes of disqualification analysis, attorney did not represent client when,

although assigned to a case that quickly settled, she never filed an appearance, never met or conversed with the individuals involved, never read or researched information regarding the claims of the case, never went to court, and never drafted any pleadings).

Nonetheless, I need not definitively resolve this point, because I conclude that RSU No. 21 falls short of making the requisite showing of actual prejudice.[11]

### 3. Showing of Actual Prejudice

In its reply brief, RSU No. 21 makes no separate argument that it has shown actual prejudice, seemingly relying on its contention that *Morin* does not apply in these circumstances. *See generally* Reply. Nor does the record disclose actual harm. As noted above, the superintendent's reaction to losing the administrative hearing decision does not qualify as a client confidence or secret, and, in any event, RSU No. 21 does not identify any concrete harm flowing from the disclosure of that information. There is no evidence that Hellstedt, who has been screened by Murray Plumb from its work on this matter, has disclosed any litigation

---

[11] It is not clear that Rule 1.9(a) even applies when a lawyer moves from one firm to another. Bryan Dench, the ethics expert hired to represent RSU No. 21, indicates that it does not. *See* Dench Letter at 3 n.2 ("On its face, paragraph (a) would be violated by attorney Hellstedt's representation of the adverse party. It appears, however, that when a lawyer moves from one firm to another, the situation is governed by Rule 1.9(b).") (citing Me. Rules of Prof'l Conduct R. 1.10 cmt. [2]). *See also, e.g., In re Outdoor Prods. Corp.*, 183 B.R. 645, 648 n.2 (Bankr. M.D. Fla. 1995) (same); Me. Rules of Prof'l Conduct R. 1.9 cmt. [4] ("When lawyers have been associated within a firm but then end their association, the question of whether a lawyer should undertake representation is more complicated. There are several competing considerations. . . . If the concept of imputation were applied with unqualified rigor, the result would be radical curtailment of the opportunity of lawyers to move from one practice setting to another and of the opportunity of clients to change counsel. Paragraph (b) operates to disqualify the lawyer only when the lawyer involved has actual knowledge of information protected by Rule 1.6 and 1.9(c). Thus, if a lawyer while with one firm acquired no knowledge or information relating to a particular client of the firm, and that lawyer later joined another firm, neither the lawyer individually nor the second firm is disqualified from representing another client in the same or a related matter even though the interests of the two clients conflict."); *id.* R. 1.10 cmt. [2] ("The rule of imputed disqualification stated in paragraph (a) gives effect to the principle of loyalty to the client as it applies to lawyers who practice in a law firm. Such situations can be considered from the premise that a firm of lawyers is essentially one lawyer for purposes of the rules governing loyalty to the client, or from the premise that each lawyer is vicariously bound by the obligation of loyalty owed by each lawyer with whom the lawyer is associated. Paragraph (a) operates only among the lawyers currently associated in a firm. When a lawyer moves from one firm to another, the situation is governed by Rules 1.9(b) and 1.10(b)."). Nonetheless, the plaintiff has not squarely made this argument in opposing the instant motion, *see* Objection at 10-11, and, therefore, I do not address it here.

strategy or that any strategy of which she is aware remains confidential.  This is fatal to RSU No. 21's quest to disqualify Murray Plumb.  *See, e.g., Concordia Partners*, 2012 WL 3229300, at *7 ("In this case, Defendant has made no attempt to show specific, identifiable harm. Nothing in the record suggests that Brann & Isaacson's representation of Early Advantage and Great Books gave them access to any confidential information that would disadvantage Ward in the pending litigation with Concordia.  Therefore, the Court alternatively concludes that the request for disqualification must be denied based on Defendant's failure to satisfy the actual prejudice prong required under *Morin*.").

### IV.  Conclusion

For the foregoing reasons, RSU No. 21's motion to disqualify Attorney O'Meara and the law firm of Murray Plumb is **DENIED**.

### *NOTICE*

*In accordance with Federal Rule of Civil Procedure 72(a), a party may serve and file an objection to this order within fourteen (14) days after being served with a copy thereof.*

*Failure to file a timely objection shall constitute a waiver of the right to review by the district court and to any further appeal of this order.*

Dated this 7th day of February, 2013.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge